# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| GREGORY EDWARDS, individually and for all others similarly situated,   ) <br> ) <br> ) <br> Plaintiff,   ) <br> ) <br> v.   ) <br> ) <br> ARAMARK UNIFORM AND CAREER APPAREL, LLC and ARAMARK,   ) <br> ) <br> Defendants.   ) | No. 14 C 8482 <br><br> Chief Judge Rubén Castillo |

## MEMORANDUM OPINION AND ORDER

Gregory Edwards ("Plaintiff") brings this collective action on behalf of himself and other similarly situated employees against Aramark Uniform and Career Apparel, LLC ("AUCA") and Aramark (collectively "Defendants") for alleged violations of the overtime provisions of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* (the "FLSA"), as well as violations of the Illinois Minimum Wage Law (the "IMWL"), 820 ILL. COMP. STAT. § 105/1 *et seq.* Defendants have filed a motion for summary judgment arguing that Plaintiff is exempt from the FLSA's overtime provisions under the Motor Carrier Act (the "MCA") exemption, 29 U.S.C. § 213(b)(1). (R. 37, Defs.' Mot.) Defendants also argue that the IMWL and FLSA are parallel and, if summary judgment is granted as to Plaintiff's FLSA claim, summary judgment should also be granted as to Plaintiff's IMWL claim. (R. 38, Defs.' Mem. at 7 n.3.) For the reasons stated below, Defendants' motion for summary judgment is granted.

# FACTS

## I. The Parties

"AUCA rents, leases and sells various products to customers throughout the state of Illinois, including garments (uniforms), and allied goods (such as linens, towels, mops, and floor mats)." (R. 38, Defs.' Mem. at 2 (citing R. 39, Defs.' Facts ¶¶ 7-9).) Under AUCA's rental services agreement, AUCA provides uniforms and allied goods to its customers and AUCA's employees visit the customers on a weekly basis to "pick up dirty items, launder them, and return them the following week." (R. 43, Pl.'s Resp. to Defs.' Facts ¶ 10.) Under AUCA's lease program, AUCA provides uniforms to the customer and "the customer launders the uniforms themselves"; however, AUCA "manages any repairs that need to be done or size exchanges and replaces wor[n] out garments." (Id. ¶ 11.) Under AUCA's direct purchase program, "a customer will pick an item from a catalog," the customer will purchase it, and AUCA "never sees the item back." (Id. ¶ 13.)[1]

Plaintiff worked as a Route Service Representative ("RSR") from early 2000 to October 3, 2014. (Id. ¶ 1; see also R. 49, Defs.' Resp. to Pl.'s Add'l Facts ¶ 4.) Every RSR in Illinois is assigned to a "market center," and Plaintiff was assigned to the "Chicago Market Center" (the "CMC"). (R. 43, Pl.'s Resp. to Defs.' Facts ¶ 15.) RSRs "provide services to customers who have entered into rental agreements and lease agreements, and sometimes provide services to customers with respect to direct purchases." (Id. ¶ 14.) Plaintiff's duties included, among other tasks: "delivering garments and allied goods to Defendants' clients"; "inspecting customers' inventories"; "picking up soiled goods"; "unloading soiled uniforms and garments" at the CMC;

---

[1] Defendants do not provide any details regarding the nature of Aramark's business and instead state that "Aramark was not Plaintiff's employer and is improperly named as a defendant." (R. 38, Defs.' Mem. at 1 n.2.) However, the Court need not resolve this issue because summary judgment is appropriate for both defendants for the reasons outlined below.

2

"generating new business on his route"; conducting "inventory control when visiting customers"; and "plac[ing] orders for [ ] merchandise on his handheld device." (R. 49, Defs.' Resp. to Pl.'s Add'l Facts ¶ 7; R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 18-19.) Plaintiff and the other RSRs assigned to the CMC worked exclusively in Illinois. (R. 49, Defs.' Resp. to Pl.'s Add'l Facts ¶¶ 5, 21.)

## II.    The Purchasing and Delivery of New and Used Uniforms and Allied Goods

As further discussed below, in order to determine whether Plaintiff and similarly situated RSRs fall under the MCA exemption, the Court must establish whether Plaintiff's job duties involved interstate activity. As such, it is necessary to examine not only the specifics of Plaintiff's job duties, but also the nature of AUCA's business activities.

### A.    Purchase and Shipment of New Uniforms

A "Grade A" garment is a "[b]rand new garment, [that has] never been worn," and a "Grade B" garment is "[e]verything else." (R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 24, 25.) All new customers receive Grade A garments. (*Id.* ¶ 26.) If a customer requests a new style or requires a special size uniform those orders are also filled with Grade A garments. (*Id.* ¶¶ 26, 27.) In addition, if a customer's uniforms are worn-out or ruined, AUCA will first attempt to fill the order with "used, Grade B garments," but if the CMC "does not have a sufficient number of Grade B garments on hand to fill the order, AUCA orders new, Grade A garments." (*Id.* ¶ 61.) The majority of the Grade A uniforms are shipped from AUCA's Distribution Center in Lawrenceville, Georgia, but some are shipped from AUCA's Distribution Center in Reno, Nevada, or from third-party vendors. (*Id.* ¶ 28; *see also* R. 49, Defs.' Resp. to Pl.'s Add'l Facts ¶ 11.) AUCA uses a third-party freight vendor, USF Holland, for its shipments from Georgia to the CMC, and it uses FedEx or UPS freight for its shipments from Nevada to the CMC. (R. 43,

Pl.'s Resp. to Defs.' Facts ¶ 28.) It is undisputed that employees at the CMC order 2000 new uniforms every week from AUCA's distribution centers in Georgia and Nevada or from other vendors. (R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 28, 67, 69; R. 44, Opp. at 5-6, 10.)

The Grade A garments that arrive at the CMC are "designated for a particular customer." (R. 43, Pl.'s Resp. to Defs.' Facts ¶ 30.) In fact, the uniforms are often "ordered for a specific wearer or employee" of the customer. (*Id.*) AUCA uses a Garment Tracking System that "will show when a garment is scanned in and scanned out of autosort, who that garment is for based on the route, day, garment identification number, and the wear[er]." (*Id.* ¶ 33.) If a Grade A garment is sent from one of AUCA's distribution centers in Nevada or Georgia, a barcode is "affixed at the distribution center." (*Id.* ¶ 35.) If a Grade A garment is sent by a third-party vendor, the barcode is affixed at the CMC. (*Id.* ¶ 36; *see also* R. 49, Defs.' Resp. to Pl.'s Add'l Facts ¶ 15.) Thus, all Grade A garments are tracked until they reach AUCA's customers via the Garment Tracking System.

When a shipment of Grade A garments arrives at the CMC, stockroom employees unpack, take inventory of, sort, and steam-clean the Grade A garments, which are then "sorted by route for the RSRs to pick up and load onto their trucks for delivery." (R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 40-42.) The Grade A garments are placed on trucks for delivery to customers "within 24-hours [sic] of receipt at the" CMC. (*Id.* ¶ 43.)

B. <u>Purchase and Shipment of New Allied Goods</u>

As for the purchasing of new allied goods, Rob Wennerstrom, the Merchandise Control Manager for the CMC, testified that he generates a weekly report that shows the "average demand per week and then the day for each allied line item," and the report is based upon "what the RSRs are ordering in their handhelds." (*Id.* ¶ 47.) As discussed more fully below, while

Wennerstrom testified that the purchasing of new allied goods is not necessarily "predetermined or predesignated for a particular client," he does place orders for new allied goods based upon a series of factors including the weekly demand reports, "inventory," his own "job knowledge," "new account" demands, and "addition[s] to an account that could be a large size." (*Id.* ¶¶ 48-50; *see also* R. 49, Defs.' Resp. to Pl.'s Add'l Facts ¶ 17.)

It is undisputed that employees at the CMC order 27,000 new allied goods every week from AUCA's distribution centers in Georgia and Nevada or from other vendors. (R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 52, 67, 70; *see also* R. 44, Opp. at 5-6, 10.) When the new allied goods arrive at the CMC they are "unboxed, hung, sorted, scanned, and steam tunneled before they can be sent to clients." (R. 43, Pl.'s Resp. to Defs.' Facts *Id.* ¶ 54.) "The majority of new allied goods are loaded onto RSRs trucks within 48-hours [sic] after arriving at the" CMC and then are "delivered by RSRs directly to AUCA's customers." (*Id.* ¶ 56.)[2]

---

[2] In response to AUCA's statement that the "majority of new allied goods are loaded onto RSRs trucks within 48-hours [sic] after arriving at the Market Center," Plaintiff states that the fact is: "Disputed. Wennerstrom testified that allied goods do not simply pass through the Chicago market center but instead must go through a process in which they are unboxed, hung, sorted, scanned, and steam tunneled before they can be sent to clients." (R. 43, Pl.'s Resp. to Defs.' Facts ¶ 56.) This answer does not substantively respond to AUCA's fact that the new allied goods are loaded onto the RSRs' trucks within 48 hours of their arrival at the CMC. The Local Rules governing summary judgment are straightforward and strictly enforced. *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) ("This Court has consistently upheld district court judges' discretion to require strict compliance with Local Rule 56.1."). When responding to a moving party's statement of facts, the non-movant must provide "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. ILL. L.R. 56.1. In addition, a response must also be relevant. *See Valenti v. Qualex, Inc.*, 970 F.2d 363, 369 (7th Cir. 1992) ("A . . . responsive statement that . . . contain[s] irrelevant additional facts[] has no standing [under the local rule]."). The consequence of failing to comply with this requirement is that the statement is deemed admitted. N.D. ILL. L.R. 56.1(b)(3)(C). Because Plaintiff's response does not comply with the Local Rules, the Court will deem this fact admitted. *Flint*, 791 F.3d at 766-67 (district court properly exercised discretion when "deeming admitted forty-two of the forty-seven enumerated paragraphs in Defendants' Rule 56.1(a) statement" based on opposing party's improper response).

## C.  Delivery of New and Used Uniforms and Allied Goods

The facts taken as a whole demonstrate that at any given time an RSR may be delivering a new uniform or allied good, picking up a dirty uniform or allied good, and/or delivering a freshly laundered rented uniform or allied good. Thus, the RSRs' trucks (including Plaintiff's) contain both new and used merchandise for delivery to customers on their routes. (*Id.* ¶ 67.) The number of the new uniforms and allied goods that RSRs deliver every week versus the number of used uniforms and allied goods that RSRs deliver every week is a contested issue. On one hand, AUCA states that "7.1% of the total goods delivered by RSRs each week were new uniforms and new allied goods." (R. 39, Defs.' Facts ¶ 72.) Plaintiff's position is that 6.7% of the total goods delivered by RSRs each week were new—specifically, 0.5% are new garments and 6.2% are new allied goods. (R. 43, Pl.'s Resp. to Defs.' Facts ¶ 72; *see also* R. 44, Opp. at 10-17.) For purposes of the motion for summary judgment, the Court accepts the non-moving party's calculation (Plaintiff's) that 6.7% of the total goods delivered by RSRs each week consisted of new uniforms and new allied goods.

## PROCEDURAL HISTORY

On October 28, 2014, Plaintiff filed this collective action against Defendants alleging that they violated the FLSA and the IMWL by "knowingly . . . permitting Plaintiff and the Class members to work in excess of 40 hours per week without properly compensating them at an overtime rate for those additional hours." (R. 1, Compl. ¶ 1.) Specifically, the complaint alleges that Defendants "misclassified Plaintiffs as exempt from the FLSA and the IMWL even though Plaintiffs did not meet any tests for exemption," and Plaintiffs "were subject to Defendants' uniform policies and practices and were victims of Defendants' schemes to deprive them of overtime compensation." (*Id.* ¶¶ 11, 15.) On December 19, 2014, Defendants answered the

complaint and asserted their affirmative defenses, including that the "claims . . . are barred, in whole or part, by one or more exemptions to the overtime provisions o[f] federal and state law, including . . . the motor carrier exemption." (R. 19, Affirmative Defenses ¶ 8.)

On March 16, 2015, Plaintiff moved to conditionally certify the case as a collective action under the FLSA. (R. 29, Pl.s' Mot. to Issue Notice.) Shortly thereafter, Defendants sought to stay Plaintiff's motion pending the resolution of Defendants' motor carrier exemption defense. (R. 33, Mot. to Stay.) On April 1, 2015, the Court granted the motion to stay. (R. 35, Min. Order.) Subsequently, Defendants filed their motion for summary judgment as to the motor carrier exemption (R. 37, Defs.' Mot.; R. 44, Opp.; R. 48, Reply), and the issue is now ripe for determination.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). In deciding a motion for summary judgment, the Court does not evaluate the weight of the evidence, judge the credibility of the witnesses, or determine the ultimate truth of the matter; instead, it is the function of the Court to ascertain whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014) (internal quotation marks and citation omitted).

"Federal Rule of Civil Procedure 56 imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary." *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014) (citation omitted). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation marks and citation omitted). If the movant carries this burden, "the non-movant . . . must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks and citation omitted). In addition, the non-movant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in their favor." *Id.* (internal quotation marks, citation, and alterations omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show that there is evidence upon which a jury reasonably could find for the plaintiff." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).

## ANALYSIS

The sole issue raised by Defendants' motion for summary judgment is whether the MCA exempts Plaintiff and similarly situated RSRs from the overtime provisions of the FLSA. If the exemption applies, then Plaintiff and similarly situated RSRs are not due overtime compensation for their work.

## A. FLSA and the MCA Exemption

The FLSA requires employers to pay employees one and one-half times their normal hourly wage for each hour they work in excess of forty hours per week. 29 U.S.C. § 207(a)(1). Generally, motor carriers whose employees engage entirely in "intrastate commerce are subject to the Secretary of Labor's jurisdiction, and consequently the overtime and maximum hours provisions of the FLSA." *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 660 (7th Cir. 2011). However, motor carriers whose employees engage "in interstate commerce may come under the Secretary of Transportation's jurisdiction under the Motor Carrier Act." *Id.* at 660-61. These employees are "exempt from the FLSA's maximum hour and overtime provisions pursuant to the FLSA's motor carrier exemption." *Id.* at 661.

While many motor carrier employers engage in both intrastate and interstate commerce, an employee "cannot be subject to the jurisdiction of both the Secretary of Labor and the Secretary of Transportation simultaneously." *Id.* Thus, the overtime provisions of the FLSA do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). According to that provision, the Secretary of Transportation may establish "(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and (2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b). This exception to the FLSA's applicability is commonly known as the Motor Carrier Act exemption. Whether the MCA exemption applies "depends both on the class to which [the] employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a). Indeed, the U.S. Court of

Appeals for the Seventh Circuit held years ago that the applicability of the MCA exemption "depends upon the activities of the individual employees." *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 235 (7th Cir. 1961); *see also Jaramillo v. Garda, Inc.*, No. 12 C 662, 2012 WL 4955932, at *2 (N.D. Ill. Oct. 17, 2012).

The MCA exemption applies if the Secretary of Transportation has the power to establish maximum hours and qualifications of service of employees. That power is triggered if two requirements are met: (1) an employee must be "employed by carriers whose transportation of passengers or property by motor vehicle is subject to [the Secretary's] jurisdiction"; and (2) an employee must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a); *see also Collins v. Heritage Wine Cellars*, 589 F.3d 895, 897 (7th Cir. 2009). "The employer bears the burden of proving the application of the exemption," *Klein v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 990 F.2d 279, 283 (7th Cir. 1999), and exemptions are to be narrowly construed against the employer. *Auer v. Robbins*, 519 U.S. 452, 462 (1997).

Thus, to determine whether to grant summary judgment for Defendants under the MCA exemption, the Court must consider: (1) whether AUCA is a motor carrier subject to the Secretary of Transportation's jurisdiction; and (2) whether Plaintiff was engaged in activity directly affecting the safety of operation of motor vehicles in the transportation on public highways in interstate commerce.

## B. AUCA is a Motor Private Carrier Subject to the Power of the Secretary of Transportation.

The parties do not dispute that AUCA is classified as a "motor private carrier" by the U.S. Department of Transportation ("DOT") and was subject to regulation by the DOT during

the relevant time period from 2000 to 2014. (R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 4, 6, 12, 40-42; R. 38, Defs.' Mem. at 7.) "The term 'motor private carrier' means a person, other than a motor carrier, transporting property by motor vehicle when (A) the transportation is as provided in section 13501 of this title; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." 49 U.S.C. § 13102(15). AUCA argues that all three elements are met here because: (1) "AUCA transports goods via public highway from out-of-state distribution centers, through its Chicago Market Center, to customers located in Illinois"; (2) "AUCA is the owner of the goods transported"; and (3) "AUCA's primary business is leasing or renting the goods to its customers." (R. 38, Defs' Mem. at 7 (citing R. 39, Defs.' Facts ¶¶ 6-7, 12, 28, 40-42, 52-55).) Plaintiff does not contest AUCA's position in his opposition to the motion for summary judgment. (*See generally* R. 44, Opp.)

In addition, "[a]n employer subject to the Secretary's jurisdiction is required to register with the Department of Transportation." *Collins*, 589 F.3d at 897. AUCA states that it is "registered with the Department of Transportation." (R. 43, Pl.'s Resp. to Defs.' Facts ¶ 4; *see also* R. 38, Defs.' Mem. at 7.) In response, Plaintiff does not specifically admit or deny whether AUCA is registered with the DOT, but he states that the fact is "[d]isputed with regards to Edward" because "Edwards testified at his deposition that he did not need a commercial license to drive his work vehicle." (R. 43, Pl.'s Resp. to Defs.' Facts ¶ 4.) This statement does not fully and substantively respond to AUCA's statement that it is registered with the DOT. As such, the Court will deem this fact admitted. *See Flint*, 791 F.3d at 766-67.

Because Plaintiff does not rebut Defendants' assertion that it is a "motor private carrier," and the record demonstrates that AUCA is registered with the DOT, the Court finds that AUCA

is subject to the power of the Secretary of Transportation. *See Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1227 (11th Cir. 2009) (concluding that the DOT had jurisdiction over defendant employer because the employer "was licensed by the DOT, has the [ ] authorizations necessary to be an interstate motor carrier, and was audited in the past by the DOT"). Accordingly, there is no genuine issue of material fact that AUCA satisfies the first prong of the MCA exemption test.

### C. Plaintiff Was Engaged in Interstate Commerce.

The parties dispute whether Plaintiff and similarly situated RSRs "engage in activities of a character directly affecting the operation of motor vehicles in the transportation on the public highways of passengers or property in interstate . . . commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a)(2). Put simply, the crux of their dispute is whether Plaintiff was engaged in interstate activity while employed at AUCA.[3] AUCA argues that it "transports its product across state lines for sale," "the product undergoes no alteration during its journey to AUCA's customer" and, thus, "the entire journey should be regarded as having taken place in interstate commerce within the meaning of the MCA's exemption from the FLSA." (R. 38, Defs.' Mem. at 14 (internal alterations, citation, and quotation marks omitted).) In response, Plaintiff argues that he and similarly situated RSRs "never crossed state lines to perform any job duties," and that the "evidence shows that Plaintiff and other RSRs have never been the final phase of an interstate journey." (R. 44, Opp. at 1-2.)

---

[3] Plaintiff does not dispute Defendants' argument and supporting facts demonstrating that "Plaintiff engaged in activities directly affecting the operational safety of motor vehicles on public highways" because: (1) the "regulations specifically identify 'drivers' as affecting the safety of vehicles"; (2) "courts in Illinois have held, without exception, that truck drivers are engaged in activities that affect the operational safety of motor vehicles"; and (3) "all of the vehicles at the [CMC] . . . which RSRs . . . used for delivering product weigh well over 10,001 pounds." (R. 38, Defs.' Mem. at 7-8 (citations omitted); *see generally* R. 44, Opp.) As such, the Court concludes that Plaintiff and similarly situated RSRs engaged in activities directly affecting the operational safety of motor vehicles on public highways.

Plaintiff's first point can be disposed of relatively quickly, but whether Plaintiff's and other RSRs' job activities were part of a continuous interstate journey requires much more attention. Plaintiff's contention that "[i]t is undisputed that Plaintiff and other similarly-situated RSRs perform services solely and exclusively within Illinois" and that the employees "were never expected to and did not cross state lines while servicing customers" is not outcome determinative. (*Id.* at 8; *see also id.* at 1, 2, 4, 7.) Courts have repeatedly made clear that "the fact that a driver has or has not crossed a state line is not dispositive. So long as the goods are being transported on an interstate journey, all legs of that journey satisfy Section 13501's requirement even if one or several of the legs are strictly intrastate." *Sedrick v. All Pro Logistics, LLC*, No. 07 C 5811, 2009 WL 1607556, at \*3 (N.D. Ill. June 8, 2009); *see also Collins*, 589 F.3d 895 (concluding that a portion of transportation that was entirely within Illinois was nonetheless interstate commerce within the meaning of the MCA); *Chao v. First Class Coach Co., Inc.*, 214 F. Supp. 2d 1263, 1272 (M.D. Fla. 2001) ("The principle that intrastate travel may qualify as a legitimate part of interstate commerce is not new."); 49 C.F.R. § 390.5 (defining "interstate commerce" as, *inter alia*, "trade, traffic, or transportation in the United States . . . [b]etween two places in a State as part of trade, traffic, or transportation originating or terminating outside the State or the United States"). Thus, the fact that Plaintiff "never crossed state lines to perform any job duties" does not alter the Court's conclusion.

Despite the fact that Plaintiff worked entirely in the state of Illinois, the interstate commerce requirement still may be satisfied *if* the uniforms and allied goods are transported within the borders of Illinois as part of a "practical continuity of movement" in the flow of interstate commerce. *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943); *see also Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 223 (2d Cir. 2002) ("Even if a carrier's

transportation does not cross state lines, the interstate commerce requirement is satisfied if the goods being transported within the borders of one State are involved in a practical continuity of movement in the flow of interstate commerce." (internal quotation marks and citation omitted)). When considering whether the goods are part of a practical continuity in the flow of interstate commerce, the critical factor is the "original and persisting intention of the shippers." *Balt. & Ohio Sw. R.R. v. Settle*, 260 U.S. 166, 174 (1922); *see also Jones*, 268 F. Supp. 2d at 1012 ("Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment." (citation omitted)); *Bilyou*, 300 F.3d at 223-24 ("Whether the transportation is of an interstate nature can be determined by reference to the intended final destination of the transportation when that ultimate destination was envisaged at the time the transportation commenced." (citation and internal quotation marks omitted)).[4]

In *Collins*, the Seventh Circuit discussed seven factors that the Interstate Commerce Commission ("ICC"),[5] the predecessor to the DOT, considers when determining the "fixed and

---

[4] Plaintiff also emphasizes that the fact that 93.3% of the goods delivered were "'used' garments and 'used' allied goods that were a part of a continuous cycle through the CMC laundromat hub, out to customers and then back to the CMC for reprocessing, all occurring exclusively within Illinois." (R. 44, Opp. at 10.) As Plaintiff argues, "[b]ecause 93.3% of the total items delivered by Plaintiff and other RSRs cycled back and forth between Defendants' CMC and their Illinois customers they are intrastate commerce and not subject to the MCA." (*Id.*) This argument misses Defendants' assertions and the relevant inquiry. Regardless of the fact that Plaintiff's job duties included the "intrastate cyclical movement of goods" (i.e., the picking up, laundering, and delivery of used goods), it is undisputed that Plaintiff's job duties *also* included the delivery of new uniforms and allied goods that originated from out of state. The Seventh Circuit has stated "a *minor* involvement in interstate commerce as a regular part of an employee's duties subjects that employee to the Secretary of Transportation's jurisdiction." *Johnson*, 651 F.3d at 661 (emphasis added); *see also Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1155 (9th Cir. 1994). Further, the relevant inquiry when determining whether Plaintiff's job activities include interstate activity for purposes of the MCA exemption is not whether the delivery of intrastate goods is subject to the MCA, but whether the injection of the new uniforms and allied goods that originate from out of state, and that Plaintiff is transporting within the borders of Illinois, is part of a "practical continuity of movement" in the flow of interstate commerce. *Walling*, 317 U.S. at 568.

[5] The ICC is "now-defunct," but was the "enforcer of the Motor Carrier Act" prior to the DOT. *Collins*, 589 F.3d at 898. The DOT now has the regulatory power to enforce and interpret the MCA. *Turk v. Buffets, Inc.*, 940 F. Supp. 1255, 1258-59 (N.D. Ill. 1996).

14

persisting intent" of the shipper. *Collins*, 589 F.3d at 899 (citing Motor Carrier Interstate

Transportation—From Out-of-State Through Warehouses to Points in Same State, 57 Fed. Reg.

19,812 (May 8, 1992)). While not explicitly adopting the ICC's seven-factor test, the Seventh

Circuit concluded that "at least four of the criteria listed . . . make sense" and could be

considered when determining a shipper's fixed and persistent intent. *Id.* at 899. The four

conditions that the Court may consider when determining a shipper's fixed and persisting intent

are whether:

> (1) the shipper, although it doesn't have to have lined up its ultimate customers
> when the product arrives at the warehouse, bases its determination of the total
> volume to be shipped through the warehouse on projections of customer demand
> that have some factual basis;
>
> (2) no processing or substantial product modification of substance occurs at the
> warehouse;
>
> (3) while in the warehouse, the merchandise is subject to the shipper's control and
> direction as to the subsequent transportation; and
>
> (4) the shipper or consignee must bear the ultimate payment for transportation
> charges even if the warehouse or distribution center directly pays the
> transportation charges to the carrier (this goes to the shipper's responsibility for
> the original interstate journey).

*Id.* at 899-900 (internal quotation marks omitted). "If these conditions are satisfied, the intrastate

leg at the end of the shipment should be deemed part of an interstate shipment." *Id.* at 900.

### 1. AUCA's Determination of the Total Volume to Be Shipped

The Court must first consider whether the method AUCA uses to determine the total

volume of new uniforms and new allied goods that will be shipped to the CMC demonstrates its

intent for those goods to continue in interstate commerce until their arrival at AUCA's

customers. *Collins*, 589 F.3d at 899.

As a preliminary matter, the parties do not dispute that AUCA orders new uniforms with a specific customer in mind. AUCA states that it "makes all of its orders for new garments for specific customers and, therefore, garments arrive at the [CMC] . . . already designated for delivery to a particular customer." (R. 38, Defs.' Mem. at 10 (citing R. 39, Defs.' Facts at ¶ 30).) AUCA has also demonstrated that most of the uniforms are ordered for a "specific wearer or employee" of the customer, and that AUCA uses a Garment Tracking System that tracks the specific uniform until it reaches its destination. (R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 30, 33.) In addition, Plaintiff concedes that the "brand new garments" (consisting of 0.5% of the RSRs' deliveries) have a "pre-determined customer destination." (R. 44, Opp. at 14.) Thus, because AUCA orders and ships the new uniforms from its distribution centers in Georgia or Nevada to the CMC with a specific customer and final destination in mind, AUCA intends for the new uniforms to be shipped within interstate commerce. *See Badgett v. Rent-Way, Inc.*, 350 F. Supp. 2d 642, 650 (W.D. Pa. 2004) (MCA exemption applied because the items shipped by the defendant distributor to local warehouses were already earmarked for specific customers); *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1470 (9th Cir. 1997) (linen service delivery driver, which ordered roughly half of the materials supplied from out-of-state suppliers based on specific customers' orders, delivered goods in interstate commerce).

As to the ordering of new allied goods, the parties dispute whether AUCA orders thousands of new allied goods every week with specific customers in mind or whether the orders are intended to merely replace the CMC's inventory. Specifically, AUCA argues that the Merchandise Control Manager "orders all new allied goods . . . based on estimated customer demand, taking into consideration a variety of factors and data points." (R. 38, Defs.' Mem. at 10-11 (citing R. 39, Defs.' Facts ¶¶ 47-49).) In response, Plaintiff argues that the new allied

16

goods (consisting of 6.2% of the RSRs' deliveries) that are ordered and shipped to the CMC "are intended to replace Defendants' stock and are not pre-determined for any particular customer." (R. 44, Opp. at 11.)

The U.S. Supreme Court has held that the MCA exemption can still apply where goods are shipped based on an anticipating or understanding of the needs of specific customers. *See Walling*, 317 U.S. at 570 ("[A] wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts," might "be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce.'"). The district court's reasoning in *Collins* is instructive. *See Collins v. Heritage Wine Cellars, Ltd.*, No. 07-CV-1246, 2008 WL 5423550 (N.D. Ill. Dec. 29, 2008). When determining that the goods delivered by the plaintiff were part of the "practical continuity of interstate commerce," the court noted that the defendant's president "used customer demand projections to determine the amount of wine [the company] would need to purchase and ship in order to fulfill its customer needs in Illinois" and when "formulat[ing] customer projections for [the defendant company], he considered historical data of both [the defendant company's] sales and [the defendant company's] customer needs." *Id.* at *18; *see also Roberts v. Levine*, 921 F.2d 804, 814 (8th Cir. 1990) (finding that the defendant engaged in some interstate commerce because, among other things, "it makes [] shipments on the basis of past demand and estimated future need"); *Atl. Indep. Union v. Sunoco, Inc.*, No. Civ.A. 03-4389, 2004 WL 1368808, at *8 (E.D. Pa. June 16, 2004) (finding shipments to be interstate in nature in part because they there were made in response to "customer demand projections" based on historic need).

Plaintiff vigorously argues that the purchasing and shipment of new allied goods is not interstate in nature because, in his view, "it is clear that the new allied goods being delivered

from out-of-state distribution centers and/or third-party vendors have one destination and one purpose—to replenish stock at Defendants' CMC." (R. 44, Opp. at 13.) However, the undisputed testimony demonstrates otherwise. AUCA's Merchandise Control Manager for the CMC testified that he places orders for new allied goods based upon several factors, including: (1) the weekly generated allied demand reports, which are based upon "what the RSRs are ordering in their handhelds" and show the "average demand per week and then the day for each allied line item"; (2) the "running inventory of all allied products" at the CMC; (3) his own "job knowledge . . . [from] the last four years"; and (4) the "merchandise requisitions that people give you when they have a new account or an addition to an account that could be a large size." (R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 45-49; *see also* R. 39-5, Ex. D, Dep. Tr. at 92:12-19, 102:9-19, 107:12-14.) In addition, new allied good ordering is based on the "existing contracts [with customers] that require AUCA to replace lost, ruined, or worn out items." (R. 48, Reply at 10 (citing R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 10-11, 46-51.) Finally, Plaintiff also testified that new allied goods are purchased "[b]ased on the customer's need." (R. 43, Pl.'s Resp. to Defs.' Facts ¶ 51.) Taken as a whole, this testimony demonstrates that AUCA orders new allied goods based upon numerous factors including the specific needs of its customers. In addition, the uncontroverted evidence demonstrates that AUCA's intent at the time it orders and ships the new allied goods from out of state is that the goods will be transported to a customer in the state, not just the CMC warehouse.

Plaintiff relies upon three cases to support his argument that the new allied goods are not part of interstate commerce because they are not ordered for any particular customer until after they arrive in Illinois. (R. 44, Opp. at 12-13.) These cases are unpersuasive. In *Watkins v. Ameripride Services*, 375 F.3d 821 (9th Cir. 2004), the U.S. Court of Appeals for the Ninth

Circuit determined that uniforms shipped from out of state and stored at an in-state warehouse were intrastate commerce. *Id.* at 825-26. When reaching this result, the Ninth Circuit relied heavily on the fact that the uniforms were held for an indefinite amount of time at a warehouse, that "the new materials delivered by [the employee] were fungible, and were taken from general inventory after the customer made an order." *Id.* at 827. Similarly, in *Southern Pacific Transportation Company v. Interstate Commerce Commission*, 565 F.2d 615 (9th Cir. 1997), the canned goods at issue were shipped from one in-state plant to another in-state warehouse and the final destination of the canned goods was not determined "until after the goods had come to rest in the [] warehouse." *Id.* at 618. *Watkins* and *Southern Pacific* are both distinguishable because, in this case, AUCA did not purchase new allied goods merely to fulfill stock or with the intention of letting the goods sit at a warehouse with no designated destination. Instead, AUCA purchased new allied goods based upon estimated customer need, what RSRs were ordering from their handheld devices, the existing contract requirements, and specific customer requests. In addition, unlike the indefinite holding period in *Watkins*, it is undisputed that the holding time for the new uniforms and new allied goods at the CMC is quite brief. Specifically, new uniforms are sent out for delivery to AUCA's customers within 24 hours of receipt at the CMC, and the new allied goods are loaded onto trucks within 48 hours after arriving at the CMC. (R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 43, 56.) As such, Plaintiff's arguments based on *Watkins* and *Southern Pacific* are not persuasive.

Plaintiff also relies upon *Baird v. Wagoner Transportation Company*, 425 F.2d 407 (6th Cir. 1970); however, in that case, the U.S. Court of Appeals for the Sixth Circuit relied upon a three-factor test articulated by the ICC in 1957. *Id.* at 410-11. This three-factor test has since been rejected by both the ICC and numerous circuits including the Seventh Circuit. *See*

*Advantage Tank Lines, Inc.*, No. MC-C-30198, 1994 WL 71208, 10 I.C.C.2d 64 (1994) ("[T]he Commission has repudiated the [1957] test."); *Collins*, 589 F.3d at 899 (holding that applying the 1957 ICC three-factor test would produce an "odd" result); *see also California Trucking Ass'n v. I.C.C.*, 900 F.2d 208, 213 (9th Cir. 1990) ("Even though the ICC has never explicitly stated that it was abandoning the more structured [1957] test, it appears that its use of that standard has been refined, if not phased out."); *Cent. Freight v. I.C.C.*, 899 F.2d 413, 421 (5th Cir. 1990) (observing that the ICC "appears to have implicitly recharacterized the applicable test"). Thus, *Baird* carries little weight.

Because the undisputed evidence demonstrates that AUCA orders the new uniforms and allied goods based in large part upon its customers' specific needs, the first factor weighs in favor of a finding that the goods delivered by Plaintiff were part of a continuous movement in interstate commerce.

### 2. Processing or Substantial Modification of the Uniforms or Allied Goods

Next, the Court must determine whether the new allied goods and uniforms undergo substantial processing or modification once they arrive at the CMC. *Collins*, 589 F.3d at 899. "[A] product is more likely to be considered shipped in interstate commerce if no processing or substantial product modification of that product occurs at the warehouse or distribution center. However, repackaging or reconfiguring (secondary packaging) may be performed." *Musarra v. Digital Dish, Inc.*, 454 F. Supp. 2d 692, 715 (S.D. Ohio 2006) (alterations, citation, internal quotation marks omitted). In addition, the Department of Labor ("DOL") has stated "that a modification that does not change the nature of the product is insufficient to create a break in that product's interstate journey." *Id.* at 716 (citing DOL Field Operations Handbook at § 24c02, 24d00).

In support of its motion for summary judgment, AUCA argues that although the new garments and allied goods are "unpacked, steamed/washed and sorted for delivery," they do not "undergo[] processing or substantial modification and, therefore, remain[] in the flow of interstate commerce." (R. 38, Defs.' Mem. at 11.) In response, Plaintiff argues that that when the new garments and allied goods arrive at the CMC they go through "a manipulation process upon arrival and do not merely 'pass through.'" (R. 44, Opp. at 14-15; *see also id.* at 11 n.10.) Plaintiff also articulates a multi-step process which occurs once the new uniforms arrive at the CMC which includes, among other steps, unloading the uniforms, notifying individuals of the arrival of the uniforms, unpacking them from boxes, hanging them up, conducting an inventory of the uniforms, transporting them to a steamer, and then steaming the uniforms. (R. 49, Defs.' Resp. to Pl.'s Add'l Facts ¶ 13.) Plaintiff insists that these steps result in "extensive processing" and "manipulation" of the new uniforms. (Opp. at 14-16).

Plaintiff's argument is unconvincing. When every single step of the process that Plaintiff has articulated is complete, what remains is the same uniform and allied good that arrived at the CMC. Put simply, the new uniforms and allied goods that depart the CMC for AUCA's customers are not materially altered—they arrive as uniforms and allied goods, and they leave as uniforms and allied goods. *See Cruz v. S. Waste Sys., L.L.C.*, No. 09-21756-CIV, 2010 WL 309016, at *4 (S.D. Fla. Jan. 25, 2010) (concluding that cardboard was not materially changed "[e]ven though the cardboard is compacted and straps are added to it for easier transport," and because the "process of prepping the material for transportation is not sufficient to deem the cardboard materially altered"); *Musarra*, 454 F. Supp. 2d at 716 ("Although Plaintiffs may spend time removing . . . [the] products from their boxes and assembling the parts before transporting

the products to customer homes, such changes are merely incidental to technicians' job of transporting and installing . . . [the] equipment for . . . [the] customers.").

In addition, Plaintiff argues that because the new uniforms and allied goods are commingled with the used uniforms and allied goods, the continuity of movement of the new goods is interrupted and, thus, the process "fails to constitute a continuous, interstate journey for purposes of the MCA exemption under the FLSA." (R. 44, Opp. at 16; *see also id.* at 2, 3, 4-5, 11, 13, 14-15.) However, whether the new uniforms or allied goods are commingled with the used uniforms and allied goods is irrelevant. The DOL has stated: "If it is known that some portion of a particular load is moving in interstate commerce, whether or not this is an identifiable portion of the load, the trip will be viewed as an interstate trip and therefore subject to the jurisdiction of the DOT." DOL Field Operations Handbook § 24c06 (1999); *see also Southland Corp. v. J.E. Shew*, 248 F. Supp. 12, 15 (N.D. Tex. 1965) ("The fact that out of state [goods] are mixed with intrastate goods is not decisive . . . ."). Critically, the commingling of these goods does not alter the nature of the goods or transform them into a new commodity. *See Goldberg v. Faber Indus. Inc.*, 291 F.2d 232, 234-35 (7th Cir. 1961) (drivers transporting meat scraps and dead animals intrastate were not engaged in interstate commerce where the meat scraps and dead animals were commingled and processed into grease, animal foods, and other products, thus completely changing their character and removing the goods from interstate commerce). Further, even if the new goods and used goods are commingled in the steam tunnels or while being transported within the CMC, at a minimum, the new uniforms are still distinguishable because they are tracked via AUCA's Garment Tracking System. (*See* R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 19, 33-34.)

Thus, because the new uniforms and allied goods are not materially processed and the nature of the products does not change once they arrive at the CMC, the second factor weighs in favor of a finding that the uniforms and allied goods delivered by Plaintiff were part of a continuous movement in interstate commerce.

### 3. While in Warehouse, Merchandise Subject to Shipper's Control

The third factor for the Court's consideration is whether "while in the warehouse, the merchandise is subject to the shipper's control and direction as to the subsequent transportation." *Collins*, 589 F.3d at 899. AUCA states that "at all times [it] retain[s] ownership of the goods that it rent[s] and lease[s] to customers on Plaintiff's route and controlled transportation of the goods." (R. 38, Defs.' Mem. at 12 (citing R. 39, Defs.' Facts ¶ 12); *see also* R. 39-6, Dec. of C. Wehner ¶ 8.) Plaintiff does not dispute AUCA's assertion that it retains ownership and control of all of the rented and leased uniforms and allied goods while these products are at the warehouse and on their way to customers. Thus, the third factor weighs in favor of a finding that the uniforms and allied goods delivered by Plaintiff were part of a continuous movement in interstate commerce. *See Finn v. Dean Transp., Inc.*, 53 F. Supp. 3d 1043, 1056 (M.D. Tenn. 2014) (MCA exemption applied because, among other factors, the defendant "control[led] the out-of-state products throughout their journey, generally on its own trucks or, in some instances, through a third-party carrier"); *Ruiz v. Affinity Logistics Corp.*, No. 05cv2125, 2006 WL 3712942, at *6 (S.D. Cal. Nov. 9, 2006) (MCA exemption applied because, among other factors, the defendant took "title to and control of the appliances from the manufacturing facility to its customers' homes" (internal quotation marks and citations omitted)).

### 4. Bearing the Payment for Transportation Charges

The fourth factor to consider is whether AUCA "bear[s] the ultimate payment for transportation charges." *Collins*, 589 F.3d at 899. In support of this factor, AUCA argues that it "bears payment for all transportation charges" because: (1) "[f]or new goods ordered from AUCA's . . . Georgia Distribution Center, AUCA contracts with, and pays common carrier USF Holland to deliver the goods to the" CMC; (2) "AUCA also covers the cost for the shipment of goods ordered from the . . . Nevada Distribution Center and other vendors outside the state of Illinois via FedEx or UPS freight"; and (3) "AUCA then provides delivery service directly to its customers via RSRs, including Plaintiff during his employment." (R. 38, Defs.' Mem. at 12 (citing R. 39, Defs.' Facts ¶¶ 18, 28, 43, 56).) Plaintiff does not dispute any of these facts. (R. 43, Pl.'s Resp. to Defs.' Facts ¶¶ 18, 28, 43, 56.) Thus, the fourth and final factor weighs in favor of a finding that the uniforms and allied goods delivered by Plaintiff were part of a continuous movement in interstate commerce. *See Collins*, 2008 WL 5423550, at *15 (goods were shipped as part of interstate commerce where defendant "arranged for the transportation of the wine from those vineyards and wineries to [the] . . . Illinois warehouse by paying for all of the transportation charges, both for the out-of-state services from the wineries and vineyards to its warehouse, and then by employing Plaintiffs to transport the wine to its local customers").

In summary, the relevant factors demonstrate that Plaintiff's in-state transportation and job activities were, as a matter of law, part of interstate commerce. In other words, Plaintiff's transportation of new uniforms and allied goods from the CMC to AUCA's customers was the last leg of what AUCA—at the time of the shipment from out-of-state distribution centers—intended to be a continuous journey through interstate commerce.

## D. *De Minimis* Exception

Finally, Plaintiff urges the Court to adopt a *de minimis* exception to the MCA exemption. Specifically, Plaintiff argues that: (1) "even if it is determined that these new garments are considered interstate commerce, they only make up 0.5% of the total items delivered each week by Plaintiff and other RSRs"; (2) "0.5% is the definition of *de minimis*"; and (3) "[c]ertainly new garments making up a mere 0.5% of Plaintiff's and other RSRs' route is insufficient to overcome the MCA threshold for purposes of the exemption as a matter of law." (R. 44, Opp. at 16-17.) In essence, Plaintiff asks the Court to conclude that even if Plaintiff's job duties included delivering a small percentage of new goods that originated from out of state, the MCA exemption should not apply. However, even if the Court were to apply the *de minimis* exception, Plaintiff cannot prevail.

In *Morris v. McComb*, 332 U.S. 422 (1947), the U.S. Supreme Court held that a carrier was subject to the MCA exemption when 3.65% of its total trips were derived from interstate commerce. *Id.* at 433. Based on the Supreme Court's consideration of the quantity of the carrier's interstate activities in *Morris*, some courts have imposed a requirement that a carrier's interstate activities be more than *de minimis* for the MCA exemption to apply. *See Turk*, 940 F. Supp. at 1261-62 (collecting cases). That exception is generally applied when the interstate activities performed by the driver are "infinitesimal" or—more concretely—less than 1%. *Peraro ex rel. Castro v. Chemlawn Servs. Corp.*, 692 F. Supp. 109, 114 (D. Conn. 1988); *see also Veliz v. Cintas Corp.*, No. C 03-1180 RS, 2009 WL 1107702, at *9 (N.D. Cal. Apr. 23, 2009) ("Based on the current showing that interstate goods comprised 1% or less of plaintiffs' deliveries, the Court finds that this level of interstate activity is not sufficient as a matter of law to trigger the MCA exemption . . . ."); *Turk*, 940 F. Supp. at 1261-62 (collecting cases applying a 1%

threshold). However, "[c]ourts have . . . generally held that the *de minimis* rule does not exempt drivers from DOT jurisdiction" because any number of interstate deliveries by a carrier, no matter how "trivial," implicates safety. *Turk*, 940 F. Supp. at 1261 (citation omitted); *see also Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 875 (3d Cir. 2015) ("Although the Supreme Court has recognized a *de minimis* exception to the application of the MCA, we have noted that [a] number of courts have held that drivers should seldom, if ever, fall within [it]." (internal citations and quotation marks omitted)).

Arguably, the *de minimis* exception is not applicable at all because the Court has already concluded that Plaintiff's job activities involved interstate activity and thus concern motor safety. However, even if the exception were to apply, Plaintiff still cannot prevail. When arguing that the Court should apply a *de minimis* exception, Plaintiff emphasizes that only 0.5% of the RSRs' deliveries consist of the new uniforms, but he is silent of the fact that 6.2% of the RSRs' deliveries consist of new allied goods originating from out of state. (R. 44, Opp. at 16-17.) Plaintiff ignores the percentage of new allied good deliveries because he asserts that AUCA does not order the new allied goods based upon the customers' specific needs and, therefore, he claims that the delivery of new allied goods is not part of interstate activity. However, the Court has already determined that AUCA orders new allied goods based in part upon the customers' specific needs. Therefore, 6.7% of Plaintiff's deliveries every week consisted of 6.2% of new allied goods and 0.5% of new uniforms. Needless to say, 6.7% is nearly seven times the 1% threshold recognized by other courts. Even if the Court were to apply the *de minimis* exception, Plaintiff's new uniform and allied good deliveries that originated from out of state and accounted for 6.7% of his deliveries exceeds the 1% threshold. *See Finn*, 53 F. Supp. 3d at 1057 ("Even if there were some basis to find that the MCA exemption should not apply to *de minimis* quantities

of goods traveling in interstate commerce, the [10%] . . . of interstate goods in trucks that Finn

drove were appreciable, and in fact exceeded the quantities of interstate goods that other courts

have found to be sufficient for application of the MCA exemption."). Thus, the *de minimis*

exception does not alter this Court's conclusion.[6]

      For all of the above reasons, summary judgment in favor of Defendants is appropriate

because Defendants are a motor private carrier subject to the Secretary of Transportation's

jurisdiction, Plaintiff was engaged in activity directly affecting the safety of operation of motor

vehicles on public highways in interstate commerce, and the *de minimis* exception does not

warrant a different result. Therefore, Plaintiff and similarly situated RSRs fall within the MCA

exemption and, thus, are not entitled to overtime pay under the FLSA.

### E. IMWL Claim

      Plaintiff also brings a related claim under the IMWL. (R. 1, Compl. ¶ 44-52.) Defendants

argue that if summary judgment is granted as to Plaintiff's FLSA claim, summary judgment

should also be granted as to Plaintiff's FLSA claim. (R. 38, Defs.' Mem. at 7 n.3.) Plaintiff does

not respond to this argument, and the Court agrees with Defendant. The IMWL contains an

analogous exemption, which excludes from its definition those individuals over whom the

Secretary of Transportation has jurisdiction under the Motor Carrier Act or the State of Illinois

under the Vehicle Code. 820 ILL. COMP. STAT. § 105/3(d)(7). Thus, because Plaintiff's FLSA

claim fails, so does his IMWL claim. *See Turk*, 940 F. Supp. at 1262 (finding IMWL claim failed

because the plaintiff's FLSA claim failed); *see also Barron v. Lee Enters., Inc.*, 183 F. Supp. 2d

1077, 1088 (C.D. Ill. 2002) (granting summary judgment to the defendants on the plaintiff's

---

[6] Plaintiff also relies upon *Watkins* to urge the Court to adopt a 3% threshold for the *de minimis* exception. (R. 44, Opp. at 16-17 (citing *Watkins*, 375 F.3d at 826).) However, even if the Court was persuaded by *Watkins*, Plaintiff does not meet the 3% threshold either.

IMWL claim because it had granted summary judgment on the FLSA claim). As such, Defendants' motion for summary judgment as to Plaintiff's IMWL claim is granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (R. 37) is GRANTED and judgment is entered in favor of Defendants. In addition, Plaintiff's motion for class certification (R. 29) is DENIED as moot.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: January 19, 2016**